☒ FILED ___ LODGED
___ RECEIVED ___ COPY

OCT 19 2011

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

SEALED

# UNITED STATES DISTRICT COURT
for the
District of Arizona

| | |
|---|---|
| United States of America<br>v.<br><br>Jean Baptiste Kingery<br>a.k.a. "JB"<br>a.k.a. Jean Baptiste Moisson Kingery<br>a.k.a. John Kingsley<br>a.k.a. John King<br>a.k.a. Juan Batista<br>a.k.a. Moss Kingery<br>a.k.a. Jeane Kingsley<br>a.k.a. Juan Baptiste Moisson De Kingery<br>a.k.a. Juan Moisson<br>a.k.a. "El Guero"<br>*Defendant* | Case No. 11-1042/M |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

**See Attachment A: Counts 1 and 2**

I further state that I am a Special Agent for the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), United States Department of Justice, and that this complaint is based on the following facts:

**See Attachment B: Statement of Probable Cause Incorporated By Reference Herein**

AUTHORIZED BY: AUSA & Special Attorney Christopher D. Grigg

☒ Continued on the attached sheet.

_____
Complainant's signature

Karl Johnson, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: October 19, 2011

_____
*Judge's signature*

City and state: Yuma, Arizona

The Honorable Jay R. Irwin
*Printed name and title*

## ATTACHMENT A: COUNTS 1 and 2

### COUNT 1

On or about June 15, 2010, in the District of Arizona, defendant JEAN BAPTISTE KINGERY did knowingly and willfully attempt to export from the United States to the country of Mexico:

 a. MK-II Grenade Shells,

 b. M-67 Grenade Shells,

 c. M-61 Grenade Shells,

 d. M213 Detonating Fuse, and

 e. M228 Detonating Fuse,

all items being "defense articles" listed in Category IV(h) of the Munitions List; and

 f. Winchester .45 Caliber 230 FMJ Ammunition, Part # Q4170, and

 g. Speer Lawman .380 Caliber Ammunition, Part #53608

both items being "defense articles" listed in Category III(a) of the Munitions List, without having first obtained from the DDTC a license for such export or written authorization for such export.

All in violation of Title 22, United States Code, Section 2778(b)(2) and (c), and Title 22, Code of Federal Regulations, Sections 121.1, 123.1, and 127.1.

### COUNT 2

On or about December 5, 2008, in the District of Arizona, in a matter within the jurisdiction of the Department of Justice Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), namely, an interview with Special Agents of the ATF, defendant JEAN BAPTISTE KINGERY knowingly and

willfully made material false, fictitious, and fraudulent statements and representations. Specifically, defendant KINGERY stated in the interview that he purchased firearms on or about November 25, 2008, in Tucson, Arizona, namely four (4) Century Arms WASR-10 7.62 x 39 caliber rifles (with the following serial numbers: 1976FX4690, 1965JL0145, 1965OP2348, 1964CD3304) and three (3) Norinco MAK-90 7.62 x 39 caliber rifles (with the following serial numbers: 101364, 9304531, and 100596), were in the possession of a friend on an Indian reservation in Parker, Arizona. This statement and representation was false and fraudulent because, in fact, as defendant KINGERY well knew, the firearms were not in the possession of a friend on an Indian reservation in Parker, Arizona.

In violation of Title 18, United States Code, Section 1001.

**ATTACHMENT B: STATEMENT OF PROBABLE CAUSE**

I, Special Agent Karl Johnson, being duly sworn, hereby depose and state as follows:

1. I am a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), in Yuma, Arizona and have been so employed since April, 2008. I have completed the ATF Special Agent training course at the Federal Law Enforcement Training Center, Glynco, Georgia. The course covers practices and methods of illegal firearm possessors and traffickers and related federal criminal statutes. I have six previous years of law enforcement experience at the municipal level as an Officer and Detective with the Arlington, Texas Police Department. As a law enforcement officer and agent, I have conducted and participated in numerous criminal investigations of both state and federal firearm violations. Through my training and experience, I am familiar with federal criminal laws relating to the unlawful export of arms from the United States, including the Arms Export Control Act ("AECA"), 22 U.S.C. § 2778, and the International Trafficking in Arms Regulations ("ITAR"), 22 C.F.R Parts 120 through 130, and the roles of the Department of State ("DOS"), Directorate of Defense Trade Control ("DDTC"), the Department of Commerce ("DOC"), Bureau of Industry and Security ("BIS"), and the Department of Treasury Office of Foreign Asset Controls ("OFAC") in investigating such crimes.

2. This affidavit is being submitted in support of a complaint to charge defendant JEAN BAPTISTE KINGERY with violations of Title 22, United States Code,

Section 2778(b)(2) and (c), Title 22, Code of Federal Regulations, Sections 121.1, 123.1, and 127.1; Title 18, United States Code, Section 924(a)(1)(A); and Title 18, 1001. The statements made in this affidavit are made based on my personal observations and investigation and information communicated or reported by other law enforcement agents officers during the investigation. This affidavit is intended to show merely that there is sufficient probable cause that the defendant committed the above-listed crimes and does not necessarily set forth all of my knowledge about this matter.

LEGAL FRAMEWORK FOR EXPORTS OF DEFENSE ARTICLES

3. This investigation concerns alleged violations of 22 U.S.C. § 2778, involving the control of arms exports and imports. AECA authorizes the President of the United States to control the export of "defense articles." 22 U.S.C. § 2778(a)(1). The Act also gives the President authority to designate items as "defense articles." As a practical matter, that task is performed by DOS, with the concurrence of the Department of Defense ("DOD"), in accordance with regulations that are promulgated by DOS, DDTC (formerly the Office of Munitions Controls). 22 C.F.R. §§ 120.1(a) and 120.2. All items that are designated as "defense articles" are identified by category in a document prepared by DDTC that is known as the "United States Munitions List" ("USML" or "Munitions List"). In order to export any item determined to be on the USML, the exporter must register with DOS and apply for a license, known as a "DSP-5", to authorize that item to leave United States territory. It is a felony to willfully violate any provision of AECA or any rule or regulation issued thereunder. 22 U.S.C § 2778(c). Pursuant to the ITAR, it is

4

a violation for a person to conspire to export, attempt to export, to export or cause to be exported any defense article for which a license is required. 22 C.F.R. § 127.1.

4. All "defense article exporters" are also required to obtain a valid export license from DDTC for any "defense article", regardless of its value, before the article is exported to another country. 22 U.S.C. § 2778(b) (2); 22 C.F.R. § 123(a). In usual practice, multiple defense articles are identified on a single export license. It is a felony for any "defense article exporter" to willfully fail to obtain an export license and to then export a defense article to another country. 22 U.S.C. § 2778(c); 22 C.F.R. § 127.1(a)(1).

5. In the application for an export license, the exporter is required to state among other things, the nature of the armaments to be exported, the end recipient of the armaments, and the purpose for which the armaments are intended. These factors and others assist DDTC in determining whether the export of the armaments would further the security and foreign policy interest of the United States or would otherwise affect world peace.

6. The defense articles which are subject to such licensing requirements are designated on the United States Munitions List ("the Munitions List"). Those designations are made by the State Department with concurrence of the Defense Department. 22 U.S.C. § 2778 (a)(1); 22 C.F.R. § 120.2.

7. Category IV of the Munitions List includes grenades hulls. 22 C.F.R. § 121.1. It is my experience that the grenade hulls described in this affidavit will fall under Category IV of the Munitions List.

5

8. Category III of the Munitions List includes ammunition. 22 C.F.R. § 121.1. It is my experience that ammunition described in this affidavit will fall under Category III of the Munitions List.

9. It is the policy of the United States to deny licenses with respect to the export of defense articles whenever and export would not be in furtherance of world peace and the security and foreign policy of the United States. 22 C.F.R. § 126.1.

KINGERY'S INSPECTION AT THE U.S.-MEXICO BORDER

10. In November 2008, ATF began investigating KINGERY for possible violations of federal firearms laws relating to purchases of rifles. During the investigation, ATF learned that KINGERY made multiple purchases of firearms and other weapons-related parts and components as further described below. Based on KINGERY's purchasing activity and records indicating KINGERY frequently crossed the United States border with the Republic of Mexico, on or about June 8, 2010, I provided be-on-the-lookout information to U.S. Customs and Border Protection ("CBP") officers at the San Luis, Arizona Port of Entry ("San Luis POE").

11. On June 15, 2010, CBP officers stopped KINGERY as he attempted to cross the border into Mexico at the San Luis POE. Special Agents from the U.S. Department of Homeland Security's Homeland Security Investigations ("HSI") and ATF responded to the San Luis POE to assist in the resulting investigation. I have reviewed the reports generated by CBP, HSI, and ATF relating to the investigation and learned the following:

    a. At approximately 2:05 p.m. on June 15, 2010, CBP Officers

conducting routine southbound inspections observed KINGERY drive past the last turn-around prior to exiting the United States and entering the Republic of Mexico. KINGERY was driving the 2003 Chevrolet Tahoe (AZ license plate # AGD1785) which was registered to him. CBP Officers referred KINGERY to the vehicle secondary area for further inspection.

  b. CBP employed a Currency/Firearms canine to search KINGERY's vehicle. While searching the rear of the vehicle, the canine alerted to the area where the spare tire is located. CBP officers used a K-910 Buster (a density meter designed to measure the difference in density between contraband and the object in which contraband is hidden) on the spare tire and received abnormally high density readings. The spare tire was removed and x-rayed. The x-ray image revealed what appeared to be hand grenades inside the tire. Further inspection resulted in the discovery of 114 inert grenades (specifically MK-II Grenade Shells, M-67 Grenade Shells, M-61 Grenade Shells, M213 Detonating Fuse, and M228 Detonating Fuse) and approximately 2,504 rounds of ammunition (including Winchester .45 Caliber 230 FMJ Ammunition, Part # Q4170, and Speer Lawman .380 Caliber Ammunition, Part #53608) hidden inside the spare tire.

  12. On June 15, 2010, law enforcement agents and officers interviewed both KINGERY and his sister, who was a passenger in KINGERY's vehicle at the time he was stopped, after the grenades and ammunition were discovered. Before the interviews began, KINGERY and his sister were advised of their <u>Miranda</u> rights and agreed to answer questions. KINGERY's sister did not appear to be involved in the incident.

7

Agents audio-recorded and documented the interviews in reports, which I have since reviewed.

13. On June 16, 2010, assisted by other federal agents and law enforcement officers, I interviewed KINGERY at the HSI office in Yuma, Arizona. The interview was audio-recorded and documented in reports, which I have also reviewed. As reflected in the reports and audio-recordings of KINGERY's interviews on June 15 and June 16, 2010, KINGERY provided the following information:

    a. KINGERY admitted that he had been attempting to smuggle the inert grenades and ammunition into Mexico and they were to be eventually delivered to individuals associated with the Sinaloa Drug Cartel.

    b. KINGERY admitted that he had engaged in prior acts of exporting grenades, ammunition, and firearms into Mexico, and that he had been obtaining and exporting these items at the specific request of members of the Sinaloa Drug Cartel and the "La Familia Michoacan" Drug Cartel ("LFM") for several years.

    c. When confronted about the grenades, KINGERY admitted that he had concealed the grenades in the spare tire. When asked why he concealed them in the tire, KINGERY stated that it seemed like a good place at the time. When asked why he concealed them at all, he stated that he was going to be paid for them (agent's note: appearing to refer to purchasers in Mexico) and that if he had left them on the seat, law enforcement would have seen them. KINGERY admitted to knowing that it was unlawful to export ammunition and firearms to the Republic of Mexico, that he had seen the signs

8

posted at the United States-Mexico border advising of the illegality of exportation of munitions, and that the Drug Cartels have persons working the ports to allow the illegal export of munitions.

      d.     KINGERY claimed, however, that he did not know that it was illegal to export the grenades because they were not live. Given KINGERY's history of purchasing large quantities of grenades described below and his admissions during the interviews, I believe that KINGERY falsely denied knowing that it was illegal to smuggle the inert grenades to Mexico. In addition to admitting that for years he had smuggled weapons into Mexico on behalf of drug cartels in exchange for money, KINGERY admitted that he expected to be paid for smuggling the grenades found in the spare tire on this occasion. KINGERY concealed the grenades in the same manner that he concealed the ammunition, which he admits knowing was illegal to export. During the interviews, KINGERY further admitted that he had previously smuggled inert grenades to Mexico on multiple occasions and that he did so by hiding them in the spare tire. KINGERY also admitted to knowing that the cartels were using grenades against each other. If, as KINGERY claimed, he did not know that exporting the grenades was illegal, concealing the grenades from law enforcement each time he smuggled them across the border would not be necessary. KINGERY's admitted efforts to hide the grenades from law enforcement detection as he attempted to cross the border demonstrate consciousness of guilt. I submit that there is sufficient evidence showing probable cause to believe that KINGERY knew it was illegal to export the inert grenades.

e. KINGERY admitted that they (agent's note: appearing to refer to the cartels) had asked him to provide handguns, but that he refused because of the problems he had with agents. This statement appears to refer to an incident discussed further below, in which ATF agents, including me, questioned KINGERY in December 2008 about his suspicious purchase of seven AK-47 type rifles on or about November 25, 2008. KINGERY added that he could not just go into gun stores to buy guns and that he did not want to go into a gun store and buy guns or ask others to buy guns.

14. On July 20, 2010, a license determination was conducted through the Exodus Accountability Referral System ("EARS") regarding the 114 inert grenades and 2,504 rounds of ammunition seized at the San Luis, Arizona Port of Entry on June 15, 2010. According to the license determination, inert grenades are controlled munitions and fall under Category IV of the Munitions List. The ammunition seized is also controlled munitions and fall under Category III of the Munitions List.

15. On July 20, 2010, a licensing history was also conducted through EARS regarding KINGERY. According to the license history there was no record of KINGERY being a Principal Party in Interest in the U.S. Department of State licensing history databases.

KINGERY'S WEAPONS-RELATED PURCHASES

16. KINGERY's statements during the interviews of June 15 and June 16, 2010, were consistent with information developed during the investigation as of those dates. KINGERY has an extensive history of purchasing weapons and related parts and

10

components, including hundreds of grenade bodies. Portions of KINGERY's purchasing history relevant to the requested charges are summarized below.

17. In November 2008, I received an investigative referral from the ATF Tucson Field Office indicating that a confidential source observed a suspicious firearms purchase on November 25, 2008 at the Second Amendment Sports Gun Store (a Federal Firearms Licensee, or "FFL") located in Tucson, Arizona. Specifically, the source stated that he/she observed KINGERY purchase three AK-47 type rifles, leave the store, and return fifteen minutes later to purchase four more AK-47 type rifles. The source also stated that he/she observed KINGERY make his rifle purchases using cash.

18. Based on my training and experience, I know that an individual who purchases a firearm from an FFL must fill out ATF Form 4473, which is the official firearms transaction record for intrastate, over-the-counter sales the dealer must maintain. On the first page of the form, the purchaser is asked: "Are you the actual transferee/buyer of the firearm . . .?" The question is followed by a warning in bold print that states: "You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person." The purchaser is also referred to the instructions for answering this question, which provides simple examples of permissible and impermissible purchases. Finally, the purchaser's certification portion of the form explicitly states that falsely answering "yes" to the actual buyer question is a crime punishable as a felony.

19. I obtained copies of ATF 4473 forms (Firearms Transaction Records Part I Over the Counter) relating to KINGERY's November 25, 2008 purchase. The records

indicated that KINGERY purchased four (4) Century Arms WASR-10 7.62 x 39 caliber rifles (with the following serial numbers: 1976FX4690, 1965JL0145, 1965OP2348, 1964CD3304), and three (3) Norinco MAK-90 7.62 x 39 caliber rifles (with the following serial numbers: 101364, 9304531, and 100596). From a review of the ATF 4473s, I learned that KINGERY had completed the forms at time the rifles were purchased and appears to have signed the forms on November 25, 2008. I also observed that KINGERY answered "yes" to the questions asking whether he was the actual buyer and claimed to be a resident of the United States who lived at 8764 South 48th Avenue, Yuma, Arizona 85364 ("the Yuma Address") listed on the 4473 forms.

20. On December 5, 2008, ATF Special Agent Robert Landis and I interviewed KINGERY at the Yuma Address. During the interview, KINGERY admitted he made the Second Amendment Sports Gun Shop purchases, but stated that the rifles he purchased were not currently in his possession. KINGERY claimed that rifles were instead in the possession of a "friend" who resided in Indian Country. When asked about the location and identity of this friend and the location of the rifles, KINGERY stated that the guns were on the Parker Reservation in a locker and that he did not know where the locker was located. KINGERY stated that his friend's first name was "Roger" but could not remember his friend's last name. KINGERY also stated that he believed Special Agents Johnson and Landis were interviewing him because of numerous sales he had made using the website www.gunbroker.com. KINGERY stated that he had done a lot of business on www.gunbroker.com and that he was concerned the agents might be investigating him for

dealing firearms without a license. As to the Second Amendment Sports purchase, KINGERY stated that he purchased the AK-47 type rifles as an investment. KINGERY then agreed to show agents the firearms on December 8, 2008.

21. On December 8, 2008, Special Agent Landis and I returned to the Yuma Address per KINGERY's instruction and made contact with KINGERY's mother, Arlene Kingery. We explained to Ms. Kingery that KINGERY had indicated he would meet the agents at the Yuma Address that same day. When I asked about KINGERY's location, Ms. Kingery stated that KINGERY had possibly gone to Mexico. Agent Landis then attempted to call KINGERY on his cellular phone, but the calls went straight to voicemail as though KINGERY's phone was turned off. Agent Landis thereafter left several messages asking that KINGERY call him back. KINGERY never returned Agent Landis's phone calls.

22. On or about December 9, 2008, ATF agents discovered that KINGERY had re-registered his vehicle in the state of Arizona on December 8, 2008. I also queried California and Arizona Driver's License databases and learned that KINGERY was issued an Arizona driver's license on November 24, 2008 listing his residence as the Yuma Address. I also learned that KINGERY also had a current and valid California driver's license which listed his residence at 1865 South Grade Road in Alpine, California. Based on my training and experience, I believe that the date of acquisition of KINGERY's Arizona license, November 24, 2008, was suspicious because he made the Second Amendment Sports rifle purchases the following day.

23. On or about January 21, 2009, Special Agent Landis and I assisted the Yuma Police Department with the execution of a state search warrant at KINGERY's sister's residence at 4510 W. Sharon Lane in Somerton, Arizona. Prior to execution of the warrant, I looked through a window and observed KINGERY inside the residence typing on a computer. Prior to officers and agents making entry, KINGERY was observed through a window crawling towards the back of the house. During the execution of the warrant, KINGERY was found concealing himself under a pile of clothes. Agents and detectives recovered multiple items during the search including: marijuana, drug paraphernalia, and the following firearms: one Romarm, model PSL-54C, AK-47 type, 7.62x39 caliber rifle, SN# K297679; one Ratmil, model WUM2, AK-47 type, 5.45x39 caliber rifle, SN# 30217397; one Norinco, model 56S, AK-47 type, 7.62x39 caliber rifle, SN# 517288; one FN, model F.A.L., .308 caliber rifle, SN# 1352; and one Glock, model 23, .40 caliber pistol, SN# AUS561US. Agent Landis and I also saw several AK-47 parts kits, de-milled AK-47 upper receivers, AK-47 barrel assemblies, trigger assemblies, magazines, ammunition, manuals, and a variety of tools including a large metal press. KINGERY remained at the residence during the search and spontaneously told agent Landis that the AK-47 parts kits and assemblies were his and that he was stockpiling them because he liked to "tinker" with weapons. KINGERY also claimed the Romarm, model PSL-54C, AK-47 type, 7.62x39 caliber rifle, SN# K297679 as his. Agents later confirmed through firearms tracing that KINGERY was the original purchaser of this firearm. KINGERY's brother-in-law claimed the other weapons.

24. None of the firearms that KINGERY purchased in November 2008 were recovered during the search on January 29, 2010. Nor have they ever been located or recovered.

25. In October 2009, I received a phone call from ATF Special Agent Meredith Davis, who informed me that she had been in contact with an owner of a military surplus store in New York named Old Sarge's Dropzone. According to agent Davis, the owner contacted her to report that, when checking through past orders, she came across an order for 120 MKII "dummy" grenade hulls placed by a person named "Jeane Kingsley" with an address identical to the Yuma Address. Agent Davis said that the name "Jeane Kingsley" did not yield any investigative leads; however, she noted that the shipping address used by "Kingsley" was the same used by KINGERY. Further investigation revealed that no-one named "Jeane Kingsley" resides or resided at the Yuma Address.

26. I contacted Old Sarge's Dropzone and spoke directly with the owner, who indicated that "Kingsley's" purchase appeared suspicious because of the large quantity of grenade bodies ordered. Additionally, the owner stated that she found the purchase suspicious because of the manner and means of payment. The owner explained that "Kingsley" ordered the grenade bodies online and went through the secure check-out process, but when he was prompted to enter in credit card information, "Kingsley" printed out the web-page and sent a copy to Old Sarge's Dropzone with a USPS money order enclosed for payment instead.

27. I spoke with the owner of Old Sarge's Dropzone again in October 2009 and

learned that in September 2009, "Kingsley" ordered grenade components—specifically 1,000 hand grenade safety clips and 900 hand grenade spring kits—from Old Sarge's Dropzone using the same "Kingsley" alias and paying with a USPS money order.

28.     In December 2009, I reviewed electronic mail ("e-mail") data relating to one of KINGERY's e-mail accounts obtained pursuant to a court order issued under 18 U.S.C. § 2703(d). While reviewing the data, I learned that KINGERY received e-mails from sales@keepshooting.com and billing@imsplus.com. I conducted an open source search related to these two companies and discovered that both IMS-PLUS and KeepShooting.com were companies specializing in military surplus gear and firearms accessories. I called KeepShooting.com and spoke to a sales representative, to whom I provided the Yuma Address. The KeepShooting.com representative located a previous order placed under the name "Jeane Kingsley" which included 25 lemon "dummy" grenade bodies and 175 pineapple "dummy" grenade bodies. The grenade bodies were paid for using a money order under the "Kingsley" name. The customer service representative also explained that he distinctly remembered the purchase because it was a large order and the grenade bodies had to be backordered. I then called IMS-PLUS and spoke to an owner. That owner confirmed that an order for 100 "dummy inert" grenade bodies was previously placed by "Jeane Kingsley" using the Yuma Address. The owner also confirmed that it was paid for by postal money order and that KINGERY's e-mail account had been used to place the order.

29.     In January 2010, I again spoke to an owner of Old Sarge's Dropzone who

16

informed me that on December 29, 2009, she received an order for 100 hand grenade spoons, 100 hand grenade head assemblies, 4,000 hand grenade spring kits, and 4,000 hand grenade safety clips. The owner said that the order was placed with three different U.S. Postal Service money orders and was made under the name "John King" using the Yuma Address.

30.     In January 2010, Agent Landis spoke to a manager of US Surplus Corporation in Phoenix, Arizona . That manager stated that on January 6, 2010, a customer, later identified as KINGERY, purchased 64 grenade bodies, two ballistic vests with ceramic trauma plates in the front and back, and three large olive drab military duffle bags. KINGERY paid for the purchase in cash. The manager stated that the customer refused to provide his name and purchased his entire inventory of grenade bodies which included pineapple, lemon and baseball styles. Because of the suspicious nature of the purchase and KINGERY'S reluctance to provide his name, one of the employees obtained KINGERY'S vehicle description (silver Chevrolet Tahoe) and license plate (AZ AGD1785). The manager recognized KINGERY as having made a previous purchase of 30-40 grenade bodies in June or July of 2009. Agent Landis e-mailed a recent CA Driver License photograph of KINGERY with no identifying information to a manager and owner of U.S. Surplus Corporation; both positively identifying the individual in the photograph as the customer who had purchased the grenade bodies and body armor on January 6, 2010.

31.     In January 2010, Agent Landis also spoke to an owner of Allied Surplus

located in Phoenix, Arizona. The owner advised that KINGERY purchased eight dummy lemon grenades, two ballistic vests, and four side trauma plates on January 6, 2010. The owner advised that KINGERY purchased his entire inventory of dummy grenades and paid cash for the order. Because of the purchase of body armor, the owner requested that KINGERY provide identification. KINGERY complied, providing his Arizona Driver License. Furthermore, the owner told Agent Landis that KINGERY made a prior purchase of grenade bodies as well as battle dress uniform pants and tops on October 27, 2009. On that occasion, KINGERY purchased 56 pineapple grenade bodies, 14 lemon grenade bodies and 20 baseball grenade bodies. KINGERY paid in cash.

32. On June 8, 2010, I received a phone call from an employee of Allied Surplus in Phoenix, Arizona. The employee informed me that only ten minutes earlier, KINGERY purchased 29 dummy pineapple grenade bodies, which was the store's entire inventory. The employee also remembered KINGERY from previous purchases he had made.

CONCLUSION

33. Based on the foregoing facts, I submit that there is probable cause to believe that, on or about the dates alleged above, JEAN BAPTISTE KINGERY committed

violations of 22 U.S.C. § 2778(b)(2) and (c); 22 C.F.R. §§ 121.1, 123.1, 127.1, 127.1(a); and 18 U.S.C. § 1001.

_____
Signature of Complainant
Karl E. Johnson

Sworn to before me and subscribed in my presence,
October 19, 2011 at Yuma, Arizona.

_____
The Honorable Jay R. Irwin
United States Magistrate Judge