# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | No. **CR-13-1607-PHX-SRB(BSB)** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | October 2, 2015 |
| **Jean Baptiste Kingery,** | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE EILEEN S. WILLETT, MAGISTRATE JUDGE**

## TRANSCRIPT OF PROCEEDINGS

## DETENTION HEARING

**APPEARANCES:**

For the Plaintiff:
    U.S. Attorney's Office - CA
    By:  **Annamartine Salick**, Esq.
         **William Arthur Crowfoot**, Esq.
    312 North Spring Street, Suite 1300
    Los Angeles, CA 90012

For the Defendant:
    Federal Public Defender's Office
    By:  **Gregory A. Bartolomei,** Esq.
    850 West Adams Street, Suite 201
    Phoenix, Arizona 85007


Transcriptionist:
Candy L. Potter
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

CR-13-1607-PHX-SRB — October 2, 2015

**I N D E X**

| DEFENSE WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

ARLENE KINGERY
By Mr. Bartolomei   25
By Ms. Salick              26


**INDEX OF EXHIBITS**

| EXHIBIT NO. | DESCRIPTION | IDENT | RECEIVED |
|---|---|---|---|
| 1 | 6-15-10 ATF Report Interview of Defendant | 7 | 31 |
| 2 | 6-15-10 ATF Report Interview of Sarah Kingery | 7 | 31 |
| 3 | 6-16-10 ATF Report Interview of Defendant | 8 | 31 |
| 4 | 6-22-10/6-23-10/7-21-10 ATF Reports Interview of Defendant | 8 | 31 |
| 5 | 8-31-11 ATF Report Interview of Defendant | 8 | 31 |
| 6 | 9-2-11 ATF Report Interview of Defendant | 8 | 31 |
| 7 | 10-14-11 ATF Report Interview of Defendant | 8 | 31 |

1          THE CLERK:  Criminal docket 13-1607, United States of

2   America versus Jean Baptiste Kingery, on for a detention

3   hearing.

4          MS. SALICK:  Good afternoon, Your Honor, Annamartine

5   and William Crowfoot on behalf of the United States.

6          THE COURT:  Good afternoon.

7          MS. SALICK:  And also joined by Special Agent Shawn

8   Sanders in the courtroom today.

9          THE COURT:  Good afternoon.

10          MR. CROWFOOT:  Your Honor, we're appearing as special

11   attorneys for the United States.  Our designation letters are

12   on file with the clerk, as is our contact information.

13          THE COURT:  And you will be filing your appearance

14   notices in this case later today or tomorrow; is that correct?

15          MR. CROWFOOT:  Yes, Your Honor.

16          THE COURT:  All right.  Thank you.

17          Are you also moving to unseal the underlying

18   magistrate case so that the clerk's office can unseal the

19   documents?

20          MS. SALICK:  We are, Your Honor.

21          THE COURT:  It is so ordered.

22          MS. SALICK:  Thank you.

23          MR. BARTOLOMEI:  And good afternoon, Your Honor,

24   Gregory Bartolomei appearing on behalf and with Jean Baptiste

25   Kingery.

─────── **CR-13-1607-PHX-SRB – October 2, 2015** ───────

1       THE COURT:  Good afternoon, Mr. Bartolomei.

2       Good afternoon, Mr. Kingery.

3       THE DEFENDANT:  Good afternoon, Your Honor.

4       THE COURT:  All right.  I also have a Financial

5  Affidavit.  The Court does find the defendant to be indigent.

6       MR. BARTOLOMEI:  Thank you, Judge.

7       THE COURT:  I know you had previously been appointed,

8  Counsel.

9       MR. BARTOLOMEI:  Yes, I had been appointed

10  conditionally back in October, Your Honor.

11       THE COURT:  Thank you.

12       Well, this is the time and place set for a detention

13  hearing.  And I did want to make sure that we were all on the

14  same page for the documentation that I have received.

15       I received a copy of the Indictment.  I did ask my

16  clerk to print off and she has the Criminal Complaint, so I now

17  have the Criminal Complaint as well as the Indictment.  And I

18  have the Pretrial Services Report.  My report is dated

19  10-1-2015 at 12:30 p.m.  Just double check to make sure we all

20  have the same report.  That's the one I'm working off of.

21       And then I also received a memorandum in support of

22  motion for pretrial release that was -- it's document 22 filed

23  on 10-2 of '15.

24       Was there anything else, any other memoranda that was

25  filed that the parties wanted me to consider?

CR-13-1607-PHX-SRB – October 2, 2015

1          MS. SALICK:  No, Your Honor.

2          MR. BARTOLOMEI:  No, Your Honor, that's the sole

3     document we were submitting.

4          THE COURT:  All right.  I do have those documents.

5     And I'm ready.

6          Are you going to be presenting testimony today or are

7     you going to be proceeding by proffer?

8          MS. SALICK:  Your Honor, we're ready to proceed by

9     proffer.  We also do have a special agent available to testify

10    if necessary.

11         THE COURT:  All right.  Thank you.

12         MS. SALICK:  As an initial matter, the Government just

13    wanted to clarify that the Government is moving forward with

14    Counts 1 and 2 of the Indictment, which relate solely to the

15    defendant's contact -- conduct on June 15th, 2010.  By the

16    terms of the extradition of removal, we are not pursuing

17    Count 3 which relates to the false statements count.

18         Your Honor, the Government is seeking detention on two

19    grounds, both on risk of flight and dangerousness.  We are

20    proceeding by proffer, we are not relying on any presumption.

21         The Government proffers the charges and facts as

22    contained in the Indictment and the Criminal Complaint, the

23    contents of the Pretrial Services report but not its

24    recommendation, as well as a selection of ATF reports which

25    memorialize the defendant's Mirandized statements to law

—— CR-13-1607-PHX-SRB — October 2, 2015 ——

1   enforcement officers through the course of this investigation,

2   which we have provided to the defense, and we also have copies

3   available for the Court.

4           THE COURT:  Have you marked them as an exhibit?

5           MS. SALICK:  We have.

6           THE COURT:  You have?

7           MS. SALICK:  We have, Your Honor.

8           THE COURT:  All right.  Are you moving them in?

9           MS. SALICK:  We absolutely can.

10          MR. BARTOLOMEI:  Judge, at this point I would be

11   objecting to moving them in on the grounds of reliability.  And

12   I think it's more appropriate for addressing at a later stage

13   in the proceedings.  I don't believe it's appropriate for

14   detention hearings.

15          THE COURT:  All right.

16          MS. SALICK:  Your Honor, the defendant's statements go

17   directly to both his dangerousness and to his risk of flight.

18   And we intend to proceed by proffer as to his very own

19   statements that he made to law enforcement agents.

20          THE COURT:  All right.  The Court will admit

21   your exhibit.  Is it Exhibit No. 1?

22          MS. SALICK:  We have Exhibits No. 1 through 7.  There

23   are seven total reports.

24          THE COURT:  And those are all the same nature of the

25   report, they're all ATF reports?

CR-13-1607-PHX-SRB – October 2, 2015

1          MS. SALICK:  That's correct, they are all ATF reports.

2     One report is a Mirandized statement of the defendant's sister

3     who was accompanying the defendant when he was detained at the

4     port of entry on June 15th, 2010.

5          THE COURT:  Okay.  Go through them one at a time so

6     that you may state an objection on the record if you have an

7     objection to each of these.

8          And do you have them separated, Marion?

9          THE CLERK:  I don't have anything.

10         THE COURT:  You don't have anything?  Oh, so they have

11    not been marked.

12         MS. SALICK:  I apologize, Your Honor, we marked them

13    previously.

14         THE COURT:  You marked them previously here?

15         MS. SALICK:  I apologize, just (inaudible) --

16         THE COURT:  Oh, that's not marking them as exhibits.

17    So let's go ahead and have the clerk mark them as exhibits, and

18    then we can discuss them one at a time in terms of whether or

19    not there are any objections to them.

20       (Discussion held off the record.)

21         MS. SALICK:  Your Honor, the Government offers seven

22    total exhibits.  The first exhibit is an ATF report dated June

23    15th, 2010, which is an interview of the defendant at the

24    San Luis point of entry.

25         The second exhibit is a ATF report dated June 15th,

CR-13-1607-PHX-SRB – October 2, 2015

1  2010, which is a Mirandized interview of Sarah Kingery, also at

2  the port of entry.

3           THE COURT:  And she is?

4           MS. SALICK:  She is the defendant's sister.  She was

5  in the vehicle when he was detained at the port of entry.

6           THE COURT:  Thank you.

7           MS. SALICK:  Exhibit No. 3 is a ATF report dated June

8  16th, 2010.  Another interview of the defendant.

9           Exhibit No. 4 is an ATF report that memorializes three

10  interviews with the defendant.

11           THE COURT:  What date?

12           MS. SALICK:  The first interview was on June 22nd,

13  2010, then June 23rd, 2010, and July 21st, 2010.

14           Exhibit No. 5 is an interview of the defendant that

15  occurred on August 31st, 2011, at the time of the defendant's

16  arrest in Mexico.  This interview was conducted by ATF agents.

17           Exhibit No. 6 is another interview of the defendant.

18  This one in Mexico City that occurred on September 2nd, 2011.

19           THE COURT:  By?

20           MS. SALICK:  And finally exhibit --

21           THE COURT:  Wait.  By who?

22           MS. SALICK:  By ATF.

23           And Exhibit No. 7 is another interview that occurred

24  in Mexico City of the defendant on October 14th, 2011, also by

25  ATF, as well as AUSAs from both the Central District of

UNITED STATES DISTRICT COURT

1    California and the Southern District of California.

2            THE COURT:  And all seven of these exhibits have been

3    provided to you, Mr. Bartolomei?

4            MR. BARTOLOMEI:  Yes, Your Honor, they have.

5            THE COURT:  All right.  And do you have a -- would you

6    like to make a record with regard to each?

7            MR. BARTOLOMEI:  Well, Your Honor, I object to all of

8    them.  I believe what the Government is doing is -- as I

9    indicated in my memorandum, I had reasonably anticipated that

10   they would be presenting what they view as the weight -- or

11   materials that go towards the weight of their case.  And I

12   don't think that's appropriate for our purposes.

13           As I've cited, and I don't think I need to go through

14   the memorandum again, there's really only two issues, and

15   that's the issue of flight and danger.  And I know that the

16   Government is arguing that these materials go towards those

17   points, but actually it's a rewording or renaming of what this

18   material actually is.  It's substantive material -- or they

19   view it as substantive material that they intend to use as part

20   of their case in chief in the main trial.

21           I don't think it's appropriate for our purposes.

22           Next, I have some real reliability concerns,

23   especially with regards to any interviews being conducted in

24   the Republic of Mexico.  The circumstances under which

25   interviews are conducted and in which prisoners are held in

—— CR-13-1607-PHX-SRB – October 2, 2015 ——

1    Mexico leaves much to be desired.

2            I'm not aware of the particular circumstance at that

3    time, including whether or not any of his constitutional rights

4    were protected or whether he was afforded the right to counsel.

5            I can tell you that since October I've been trying to

6    see him, and the consulate was of zero help.  And up until this

7    week when we were told we could visit him, and I was planning

8    to visit him on Tuesday, and then yesterday I got the notice

9    that he was already here.

10           So I have real reliability concerns about anything

11   contained in these reports.  But those are matters, again, that

12   will be explored and developed as the case proceeds, because it

13   does go towards the substantive presentation of the case.

14           In addition, with regards to any statements allegedly

15   made by his sister, I have not only Sixth Amendment concerns,

16   but *Crawford* concerns.  I'm not aware of the circumstances from

17   independently researching or investigating what reliability

18   factors are present for anything she may or may not have said.

19           So in essence, Your Honor, I object to all of this

20   material.  It goes -- it is another way of saying, look at the

21   strength of our case.  I don't think it's appropriate for

22   resolution at this time.

23           THE COURT:  Thank you.

24           And would you like to respond?

25           MS. SALICK:  Yes, Your Honor.

1           Your Honor, we are not relying on any of these

2   documents to prove any element of the offense at this

3   time -- offenses at this time.  The reports contain essential

4   facts that go to the factors that we are instructed to look at

5   for detention, both to risk of flight as well as to

6   dangerousness.  And that is the sole purpose that we are

7   relying on them today.

8           In regards to reliability, we -- we anticipate

9   suppression litigation at the time of trial, but that is not

10  what -- the question that is before the Court today.

11          And, again, these are offered specifically to address

12  the detention factors as enumerated in the statute that we

13  should be looking at today for risk of flight and

14  dangerousness.

15          THE COURT:  Thank you.

16          And then anything in rebuttal?

17          MR. BARTOLOMEI:  Yes.  In rebuttal, Your Honor, I

18  would simply say that with regards to any aspect at any stage,

19  including initial proceedings such as this one, reliability is

20  always a concern for the Court.  And if reliability does not

21  satisfy the Court, or the Court is not satisfied that there are

22  enough reliability factors in place, the Court should not

23  accept the evidence.

24          We do not believe that those factors are properly

25  presented before the Court, and there's too many questions, too

———— **CR-13-1607-PHX-SRB — October 2, 2015** ————

1    many variables, certainly years that have gone by.  And it

2    happened out of country.  So we are urging the Court not to

3    accept, and we object.

4         THE COURT:  All right.  Having heard the argument of

5    counsel with regards to Exhibits 1 through 5, the Court will

6    allow the Government to proceed by proffer and lay additional

7    foundation with regard to reliability as it proceeds.  At the

8    end the Court will make a determination whether or not to admit

9    for purposes of this detention hearing Exhibits 1 through 7.

10        MS. SALICK:  Thank you, Your Honor.

11        THE COURT:  Go right ahead.

12        MS. SALICK:  Your Honor, to begin with, the Government

13   submits that there's clear and convincing evidence that the

14   defendant poses a danger to this community and to other

15   communities.

16        Looking at the nature and circumstances of this

17   offense, this is an inherently violent and dangerous crime.

18   When the defendant was detained at the San Luis point of entry

19   in 2010 he was carrying over 100 grenade parts and 2500 rounds

20   of ammunition which were concealed in a tire.  Once repurposed

21   each of these grenades could inflict untold damage, as well as

22   each round could be deadly.

23        Moreover, in the defendant's Mirandized statements to

24   law enforcement officials over the course of this time, he

25   admitted that he knew the purpose of these grenade parts and

CR-13-1607-PHX-SRB – October 2, 2015

1    ammunitions.  And the purpose was that they were going to be

2    transmitted to the Mexican cartels.  And that he was also aware

3    of the violent ways in which these grenades and ammunition

4    could be used.

5          On September -- September 2nd, 2011, in a Mirandized

6    interview he told agents that he knew that grenades were used

7    by cartels against rival cartels.  And he also explained

8    knowledge of an event where he witnessed cartels -- or knew of

9    cartels throwing grenades into a crowd in an assassination

10   attempt.

11         Moreover, this offense is not only one of smuggling,

12   because as the defendant himself told law enforcement agents,

13   he instructed cartel members in Mexico in how to repurpose

14   grenade hulls into live, active grenades.  And further, he

15   instruct cartel members to, as his own words, make them

16   function more efficiently.

17         He admitted to testing grenades and offering solutions

18   as to how to use slower-burning fuses to make these more

19   efficient.  And he also told agents that he brought tools from

20   his Yuma residence to help the cartels improve the function of

21   grenades.

22         Moreover, Your Honor, this was not a single instance.

23   The defendant admitted to smuggling grenades numerous times

24   across the border -- grenade parts, excuse me, across the

25   borders.  He boasted to agents that he earned between 60 and

1    $70,000 smuggling grenades and remanufacturing grenades over

2    this time period.

3            And in addition, he admitted to smuggling other items

4    and contraband, to include drugs, AR15 and other gun parts, as

5    well as being -- he admitted to being tasked by the cartel to

6    acquire a multi-barrelled grenade launcher.

7            The date -- the defendant remains a danger today

8    because he possesses this specialized skill.  He has a

9    specialized skill in both repurposing weaponry, which is

10   extremely valuable to organized crime organizations, as well as

11   a specialized knowledge in evading law enforcement.

12           Moreover, he has shown when he told law enforcement

13   agents that he didn't feel particularly bad about his actions,

14   that there's no reason to believe that he wouldn't engage in

15   this activity again.

16           With respect to flight, the Government submits that

17   there's a preponderance of evidence that shows the defendant

18   presents a serious risk of nonappearance.  The defendant has no

19   significant ties to this District.  He has no gainful

20   employment, which was -- which was noted in the Pretrial

21   Services' Report.  He has no assets or liabilities in this

22   District.  And prior to his -- his detention Pretrial

23   Services -- he told Pretrial Services that he was

24   self-employed.  He does not own a home in this District.

25           However, he does have significant ties to a foreign

UNITED STATES DISTRICT COURT

CR-13-1607-PHX-SRB – October 2, 2015

1    country, and that is Mexico.  He is married to a Mexican

2    citizen with whom he has two children.  And his wife and

3    children live at a home that he owns in Mazatlan, Mexico.

4            He also told agents about a second property in Mexico.

5            He has a network of associates in Mexico, including

6    members of the Sinaloa cartel, through which he stated that he

7    was introduced through his wife in Mexico.

8            And as we have pointed out, he has a specialized skill

9    and an ability to earn money and support himself in Mexico.

10   This specialized skill doesn't just make him dangerous, it

11   makes him a risk of flight.  He has an expertise in trafficking

12   and repurposing weapons that makes him valuable to criminal

13   organizations, and which allows him an ability to earn money

14   quickly and illegitimately.  And he has an expertise in

15   crossing international borders and evading law enforcement.

16           The Pretrial Services' Report noted that as a factor

17   of dangerousness he has various aliases.  And he himself has

18   admitted to a long history of trafficking weapons across the

19   U.S./Mexico border.

20           With respect to his family, in the defendant's own

21   words he stated that his family has turned a blind eye to his

22   activities here in the United States.  And the Government

23   submits that his family is not in a position to assure the

24   Court of his appearance or his compliance with the terms of

25   release.

UNITED STATES DISTRICT COURT

1          With respect to his mother who's been offered as a

2     third-party custodian, in 2008 when the ATF began its

3     investigation, the defendant agreed to meet agents at his

4     mother's home in Yuma.  And when they appeared at his mother's

5     home, he was not there, and his mother told agents that he was

6     not there and may have gone to Mexico.

7          The defendant told agents that he would -- that he

8     purchased weapons and grenade hulls numerous times, and that he

9     would have these packages sent to his mother's home in Yuma,

10    and he would call his mother beforehand to let her know that

11    the packages were coming.

12         After his detention in June of 2010 when agents

13    arrived at his mother's house as requested by the defendant, he

14    brought grenade parts from his mother's house and turned them

15    over to the ATF.

16         Moreover, as the Pretrial Services' Report indicated,

17    the defendant's mother is not aware of his home address in

18    Mexico.

19         There's no reasonable expectation that the mother or

20    any other family member can assure his compliance with release

21    conditions.

22         Similarly, the defendant has a history of breaking his

23    own agreements and representations to law enforcement.  In

24    2010, after his detention at the San Luis port of entry, he

25    told law enforcement that he would be available and that he

1   would cooperate.  He met with agents the next day, and after

2   that he did not return the agents' phone calls.  Just seven

3   days later, on June 22nd, 2010, the defendant was detained as

4   he attempted to enter the United States at the Calexico point

5   of entry.  When he was detained agents noted that he was

6   intoxicated.

7           The defendant is an opportunist who agrees to the

8   terms of -- who agrees to cooperate with the Government and

9   then breaks his promises.

10          The defendant also attempted to evade arrest.  U.S.

11  law enforcement officers who assisted in the arrest in 2011 in

12  Mexico noted that the defendant attempted to evade arrest,

13  which led to a car chase and his own vehicle ramming into

14  several other cars.

15          The Government also notes that the defendant's

16  statements to Pretrial Services are in contradiction to the

17  defendant's statement that he made to law enforcement officers

18  in the past, as well as law enforcement officers own

19  observations of the defendant.

20          The defendant reported to Pretrial Services yesterday

21  that he had no history of alcohol or illicit drug use.  On June

22  16th, 2010, the defendant told agents in a Mirandized statement

23  that he used cocaine regularly after moving to Mexico and

24  Mazatlan, on a weekly basis.

25          In addition, as discussed when he was detained at the

CR-13-1607-PHX-SRB — October 2, 2015

1    Calexico point of entry, just days after his arrest in the

2    charged offense, he appeared intoxicated and admitting to using

3    alcohol and cocaine.

4         Your Honor, the weight of the evidence against the

5    defendant is very strong.  Primarily the defendant's own

6    statements show that he knew the violent purposes that the

7    grenade hulls and ammunition that he was carrying that day in

8    his spare tire would be used by drug cartels.

9         In addition, we have the seized ammunition and

10   grenades that were seized when he was at the port of entry.

11        The defendant also faces significant exposure under

12   the statutory maximums.  Count 1 carries a maximum penalty of

13   20 years, and Count 2 carries a maximum penalty of ten years.

14        With respect to the reliability of the reports,

15   Your Honor, prior to each meeting with law enforcement agents

16   he was Mirandized.  In addition, when he was detained in

17   Mexico, at the beginning of each interview he was asked by

18   agents if he was being treated well and if he had been

19   threatened or tortured, or subjected to any threats or physical

20   harm.  He answered no.  There are also photos taken of the

21   defendant's person after the arrest and after the -- prior to

22   the interviews to show that there were no markings on his body

23   to indicate that he had been subject to any physical harm.

24        In addition, all of the Mexico recordings -- the

25   Mexico interviews were recorded, and those recordings have been

1    provided to the defense.

2            Your Honor, by the defendant's own admission he's a

3    danger to numerous communities.  He is an expert in crossing

4    international borders and evading law enforcement.  He

5    possesses a valuable skill that is desirable for criminal

6    organizations, and an ability to earn large sums of money

7    illicitly.  He has a history of breaking his own agreements

8    with law enforcement.  He has criminal associates in a foreign

9    country.  And by his own words his family has turned a blind

10   eye to his activities.

11           Therefore, the Government submits that there's no

12   condition or combination of conditions that would reasonably

13   assure his appearance or the safety of the community.

14           THE COURT:  Thank you.

15           MS. SALICK:  Thank you.

16           THE COURT:  Go right ahead, Counsel.

17           MR. BARTOLOMEI:  Your Honor, one of the things -- one

18   of the reasons why we have a trial is that when allegations

19   such as the ones we've heard and the alleged supporting

20   background material are brought forth in a courtroom, they're

21   dismantled by defense counsel.  And the trials go -- the trial

22   attorneys go back and forth until ultimately the facts are

23   whittled down so that the jury knows what to believe, or can

24   determine what to believe and what not to believe.

25           And everything that counsel has just mentioned are

1    matters that are for trial, not for this hearing.

2           Again, I am -- even though counsel can say, well, you

3    know, the reliability factors are there, he was photographed to

4    make sure there were no injuries, we don't -- we have not had

5    access to any of that in terms of our own investigation.  We

6    have not had this case long enough to be able to investigate

7    that.  And there are many matters that need to be discussed and

8    shared with the defendant, who obviously has not reviewed any

9    of it.

10          So, again, matters for trial, as I've set forth in my

11   memorandum, I stand by that, and I stand by the objections

12   which I've raised before.

13          With regards to what is before Your Honor that can't

14   be disputed, we have a defendant -- an accused person with no

15   prior convictions of any kind.  He does have connections to

16   Arizona, and the connections are sitting three rows behind me.

17   Two of his children are present as well as his mother.

18          As Pretrial Services has confirmed, she is willing to

19   not only provide him with a place to live -- and she's prepared

20   to come to the lectern to answer Your Honor's questions in that

21   regard.  She will not only provide him a place to live, she

22   will serve as a third-party custodian.

23          And in speaking with her, I have underscored the

24   importance of that role, including calling the Marshal's

25   Service immediately if there's any inkling of a violation of

1    any of the terms of release imposed by the Court.  And that

2    could include flight or use of any type of substance or

3    whatever.

4            There are no weapons in the house.

5            The daughter who's present is in college.  The son

6    who's present is in high school.  And they would provide him

7    literally with his daily support.

8            This would be in addition to an ankle monitoring

9    device, which we are more than willing to accept, and which my

10   client is amenable to.

11           All of which points to sufficient indicia of

12   reliability for this Court in a concrete way that he's not

13   going anywhere.  And he poses his record of no convictions,

14   nonaccess to any weapons in the house.  All of these factors --

15   no -- no threat to any person or to the community at large.

16           We believe he's satisfied the criteria for purposes of

17   release.

18           Now, with regards to some of the comments that were

19   made, there's going to be very clear disagreement, and we

20   intend to prove it.  For example, his ownership of a home in

21   Mexico, we intend to prove that's not even close.

22           So -- but rather than going through all of these

23   factors, we need to develop them.  But those are matters to

24   develop as the case proceeds.  That is why case law holds that

25   while a magistrate judge or a district court judge can consider

1   the weight of the evidence at a detention hearing, it is not

2   the most important factor, nor is it certainly the

3   determinative factor for purposes of deciding release.

4        It is the other specific factors listed in Title 18

5   which set forth the character of the defendant, his financial

6   resources and matters like that, which I have set forth in my

7   memorandum, that is what the Court should really focus on.  And

8   yes, of course, consider to some degree the weight of the

9   evidence, but that is to be -- that is going to be disputed.

10  We have entered a plea of not guilty to each and every count

11  and we intend to fight those charges.

12       Now, I am prepared, if the Court wishes, to have

13  Mrs. Frances come forward and answer any questions by the

14  Court.  She is prepared to serve as third-party custodian.  And

15  I am prepared to put her on -- at the lectern if you wish.

16       THE COURT:  Because the Court would not want to -- if

17  the Court were to release the defendant, I would not want his

18  mom to have to come back again, I will go ahead and let you ask

19  her whatever questions you'd like to at this time.

20       MR. BARTOLOMEI:  May I call her forward?

21       THE COURT:  Yes.  Come right on up to the lectern,

22  ma'am.  We're going to swear you in.  If you could raise your

23  right hand.

24       MR. BARTOLOMEI:  Your Honor, just so counsel and the

25  Court knows, she has a lot of difficulty hearing.

——— **CR-13-1607-PHX-SRB – October 2, 2015** ———

1          THE COURT:  Oh, maybe the headset would be helpful.

2          MR. BARTOLOMEI:  We have headsets.

3          MS. KINGERY:  Oh, great.  Yeah, I haven't heard

4   anything so far.  I left my hearing aid in the car because it

5   was a mad rush to get here.

6          THE COURT:  This may help.

7          MS. KINGERY:  I can't believe I did that.

8          THE CLERK:  Test test, are you able to hear?

9          MS. KINGERY:  Yes.  Thank you.  That's great.

10          THE CLERK:  Please raise your right hand.

11      (ARLENE KINGERY, DEFENSE WITNESS, SWORN.)

12          THE CLERK:  Thank you.

13          THE COURT:  Please tell me your name, ma'am.

14          MS. KINGERY:  Arlene Kingery.

15          THE COURT:  Miss Kingery, are you the mother of

16   Mr. Kingery who's sitting right here?

17          MS. KINGERY:  Yes.

18          THE COURT:  All right.  And, ma'am, how old are you?

19          MS. KINGERY:  Sixty-six.

20          THE COURT:  And where do you reside?

21          MS. KINGERY:  Yuma, Arizona, 8764 South 48th Avenue.

22          THE COURT:  The attorney has indicated to me that you

23   would be willing -- if the Court were to release your son, that

24   you would be willing to serve as a third-party custodian.  Is

25   that correct?

**CR-13-1607-PHX-SRB — October 2, 2015**

1        MS. KINGERY:  Yes.

2        THE COURT:  Do you know what it means to be a

3   third-party custodian?

4        MS. KINGERY:  Well, I took in a foster child as a

5   nonlicensed person about two years ago, so I've had to deal

6   with a teenager with alcohol, drugs, staying out.  And I've had

7   to do some intervention, call the Sheriff's Department.  And

8   fortunately he's doing great now.  But --

9        THE COURT:  This indicates to me that you're telling

10   me that you are aware then that a third-party custodian who

11   serves in that capacity in the Federal District Court would be

12   responsible for making sure that the person who they have

13   third-party custody over, which in this case would be your son,

14   would follow the directives that the Court gave him, and that

15   if he did not -- most importantly, if he did not that you would

16   call the United States Marshals and/or Pretrial Services.  Is

17   that correct, would you do that?

18        MS. KINGERY:  Yes.  Because I understand that I have

19   to.

20        THE COURT:  And if you didn't you would be in legal

21   trouble.  Do you understand that?

22        MS. KINGERY:  Yes.  Because I wouldn't want to

23   jeopardize having my four grandchildren that I'm taking care of

24   that are still in school.

25        THE COURT:  And your four grandchildren are your son's

1   children?

2          MS. KINGERY:  Yes.

3          THE COURT:  All right.  Go ahead, Mr. Bartolomei.

4          MR. BARTOLOMEI:  Your Honor, very briefly.

5                        DIRECT EXAMINATION

6   BY MR. BARTOLOMEI:

7   Q.  Ma'am, do you have any weapons in the house?

8   A.  No.

9   Q.  Were you interviewed by Pretrial Services yesterday?

10  A.  Yes.

11  Q.  Okay.  And the other people that -- everyone that resides

12  in the house currently is family?

13  A.  Well, I have the one non -- one child I've taken in under

14  foster care that's due to be 18 in November.  So I have him

15  there.

16          And then I have three children that come on the

17  weekends that are ex-foster children, to eat at my house,

18  because they kind of fall between the cracks.  So I provide

19  food for them, and they usually come on the weekends to hang

20  out and eat.

21  Q.  Okay.  Is there any kind of drug activity or anything like

22  that going on in your house?

23  A.  No.  They have tried, but they know they can't do that.

24  And my one child is on a mandatory random testing program, and

25  he's been clean for about six months now.

─────Arlene Kingery – Cross-Examination─────

1  Q.  Okay.  Now, Mr. Kingery's son, does he attend school?

2  A.  Yes.  Eric's a senior this year.

3  Q.  All right.  And his daughter, does she attend school?

4  A.  Rebecca just graduated, and so she's planning to work.  But

5  she has a congenital heart condition, so we -- she has

6  problems.

7  Q.  Do you have a landline telephone at home?

8  A.  Yes.  I have a landline.

9  Q.  Okay.  And that's working?

10  A.  Yes.

11       MR. BARTOLOMEI:  Okay.  Your Honor, I have no further

12  questions.  I don't know if the Government does.

13       THE COURT:  All right.

14       MS. SALICK:  Yes, Your Honor, just a few.

15       THE COURT:  Go right ahead.

16       MS. SALICK:  Your Honor, Mrs. Frances stated that she

17  has not been able to hear anything in court today.

18                    CROSS-EXAMINATION

19  BY MS. SALICK:

20  Q.  Were you able to hear the offenses that your son is charged

21  with?

22  A.  No.

23  Q.  Would it surprise you to learn that your son is charged

24  with transporting 114 grenade hulls?

25  A.  You're not on this set.

—Arlene Kingery – Cross-Examination—

1          THE COURT:  Counsel, you may -- there you go.

2    BY MS. SALICK:

3    Q.  Can you hear me now?

4    A.  Yes.

5    Q.  Would it surprise you to learn that your son was -- is

6    accused of transporting 114 grenade hulls, which are grenade

7    parts, and over 250 rounds of ammunition into Mexico?

8    A.  I know I've seen that in the news, and I know I -- that

9    when he was going across one time, that he was stopped by ICE

10   and they did find things in his door.  And my daughter was with

11   him at the time, so we were aware of it.

12   Q.  Okay.  Did your son send packages to you?

13          THE COURT:  Oh, hang on, Counsel.

14          MR. BARTOLOMEI:  Your Honor, I'm going to object to

15   that.

16          THE COURT:  Hang on, Counsel.

17          Ma'am, you've been placed under oath.  You must tell

18   the truth when you're under oath.  You can be convicted of

19   perjury if you lie.  The Government has the right in a

20   prosecution for perjury or false statement to use against you

21   any of the statements that you give when you're under oath.

22          Counsel, your question should be limited to her

23   ability to serve as a third-party custodian.  Thank you.

24          MS. SALICK:  Thank you, Your Honor.

25   BY MS. SALICK:

—Arlene Kingery – Cross-Examination—

1  Q.  Mrs. Frances, you stated earlier that there are no drugs in

2  the house.

3  A.  Right.

4  Q.  Are you aware that your son has connections with drug

5  cartels?

6  A.  I don't know that he had connections with them.  I know he

7  knew a lot of people in Mexico.  But he didn't –– like, you

8  know, oh, that's a drug cartel person, or that's this person.

9  I never knew.

10        I mean, I spent every Summer at the house when he was

11  in Mexico, with the kids, and I never saw anything like that.

12  When –– when they did find the grenades in the car that time,

13  he never came back across, he was afraid to.  So for his

14  visitation for his children every two weeks I would always take

15  the kids across to San Luis and we'd stay at a hotel with him,

16  or we'd stay in Calexico with him.

17        So I never saw anyone, you know –– I mean, other than

18  people at the hotels and things like that.  I never saw anyone

19  come to the house that would have been identified like that.

20  And even when we'd go in the car with him and we'd go places

21  and things like that, I never saw anything like that.  It was

22  always us and the kids were with him.  So I wouldn't know.

23  Q.  Were you aware of a search warrant that was executed at

24  your daughter's house that revealed drug paraphernalia and

25  firearms?

—**Arlene Kingery – Cross-Examination**—

1          MR. BARTOLOMEI:  Your Honor, at this point I'm going

2    to object.  I see that as well beyond the scope of the hearing

3    and the purpose for Mrs. Kingery actually being here and put

4    under oath for serving as a third-party custodian.

5          THE COURT:  Counsel, is this the same house where the

6    mother resides?

7          MS. SALICK:  It was not, Your Honor.  But the –– the

8    mother has stated that there are no drugs in the house, but it

9    does appear that the defendant may have access to a location

10   where drugs and firearms were found.  Both drugs and firearms

11   were explicitly stated by the mother as not being present in

12   the house.

13         THE COURT:  All right.  You have indicated to the

14   Court the information that you'd like the Court to know, so you

15   may move on.

16         MS. SALICK:  Thank you, Your Honor.

17   BY MS. SALICK:

18   Q.  Mrs. Kingery, it sounds like you have many people in your

19   house.  By my count it sounds like up to eight teenagers at any

20   time.

21   A.  Well, I have four of my grandchildren and one foster child,

22   so that's five.  And then I have the two kids or three that

23   come on weekends to eat.  They don't sleep there or anything

24   like that, they just come and I feed them.

25   Q.  And I believe one of them has extensive –– a congenital

—Arlene Kingery – Cross-Examination—

1    heart condition that requires additional care?

2    A.  Yes, that's my granddaughter.

3           MS. SALICK:  No further questions, Your Honor.

4           THE COURT:  Thank you.

5           Did you have anything further?

6           MR. BARTOLOMEI:  Nothing further.  Thank you,

7    Your Honor.

8           THE COURT:  Thank you, Miss Kingery.  You may be

9    seated back in the gallery.

10          MR. BARTOLOMEI:  May I approach?

11          THE COURT:  Yes, please.

12          Thank you, Counsel.

13          Mr. Bartolomei, did you have anything further?

14          MR. BARTOLOMEI:  No further witnesses, Your Honor.

15   Nothing further at this time.  Thank you.

16          THE COURT:  Thank you.

17          And then the Government in rebuttal?

18          MS. SALICK:  Just in conclusion, Your Honor, the

19   Government does not believe that, as admirable and respectful

20   as Ms. Kingery is, a 66-year-old woman who has up to eight

21   children in her house, can assure the appearance of an

22   individual who has evaded law enforcement, crossed

23   international borders, and admitted to being a smuggler for the

24   cartels.  Nor the safety of the community.

25          And, therefore, the Government moves that the

1    defendant is detained.

2              THE COURT:  All right.  Thank you very much.

3              At this time the Court will admit Exhibits 1 through

4    7.

5         (Exhibit Nos. 1 through 7 admitted into evidence)

6              THE COURT:  I will be reviewing the exhibits.  I will

7    also review the Complaint that has been unsealed and the

8    documentation attached to it, that I had not reviewed prior to

9    coming in.  And I will be issuing a decision by the end of the

10   day.  That order will go out by the end of the day.

11             If, in fact, the defendant is released then I will set

12   another hearing for having him come back so that he can go over

13   conditions of release.  If he is detained, sir, then you'll be

14   detained.

15             But that order will come out by the end of today.

16             If there's nothing further then?  Counsel for the

17   Government?

18             MS. SALICK:  No, Your Honor.  Thank you.

19             THE COURT:  Counsel for the defense?

20             MR. BARTOLOMEI:  May I have a second?

21             THE COURT:  Yes, go right ahead.

22        (Discussion held off the record.)

23             MR. BARTOLOMEI:  Nothing further.  Thank you very

24   much, Your Honor.

25             THE COURT:  Thank you very much.

———— CR-13-1607-PHX-SRB – October 2, 2015 ————

1          This hearing is now closed.

2      (Brief recess taken.)

3          THE COURT:  Wait a minute.  Are you back on?

4          THE CLERK:  Yes.

5          THE COURT:  We are back on the record.  The record

6   will reflect the presence of counsel and the defendant.

7          Yes?

8          MS. SALICK:  I apologize, Your Honor.  In the event

9   that the Court finds the defendant is suitable for release, the

10  Government intends to respectfully appeal that order.  And we

11  understand -- and I apologize again, we are practicing out of

12  our district and out of our local rules, but we would -- we

13  have heard that it's filed two or three days after the order

14  comes out.  Is that the timing of the motion?

15          THE COURT:  Oh, you're talking about when it actually

16  is docketed.  That depends.  That does depend.  But, yes, that

17  does depend, you are correct.

18          This is not a duty week, however, for me, so I would

19  not be generating -- I am holding this hearing -- I'm holding

20  this hearing not as part of a duty week and, therefore, I am

21  not generating any other detention orders at this time.  So

22  there won't be a volume problem.

23          MS. SALICK:  Okay.

24          THE COURT:  All right?

25          MS. SALICK:  Thank you very much.

—**CR-13-1607-PHX-SRB – October 2, 2015**—

1          THE COURT:  All right.  If, in fact, that's why it

2    takes a couple of days for them all to hit the docket, it might

3    be a volume issue.  You would not have that issue with regard

4    to this particular case because of the fact that I'm not on

5    duty at this time.

6          All right.  Thank you.

7          MR. BARTOLOMEI:  Thank you, Your Honor.

8          MS. SALICK:  Thank you, Your Honor.

9

10                              -oOo-

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                        C E R T I F I C A T E

5

6            I, CANDY L. POTTER, court-approved transcriber,

7    certify that the foregoing is a correct transcript from the

8    official electronic sound recording of the proceedings in the

9    above-entitled matter.

10

11           DATED at Phoenix, Arizona, this 29th day of January,

12   2016.

13

14

15

16                              s/Candy L. Potter__
                                Candy L. Potter
17

18

19

20

21

22

23

24

25