CR13-01607-PHX-SRB   SENTENCING   9-20-2016

## UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| United States of America, | ) |
| | ) |
| Plaintiff, | ) |
| | ) **CR13-01607-PHX-SRB(BSB)** |
| vs. | ) Phoenix, Arizona |
| | ) September 20, 2016 |
| **Jean Baptiste Kingery,** | ) 10:03 a.m. |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

**BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE**
**REPORTER'S TRANSCRIPT OF PROCEEDINGS**
**SENTENCING**


**APPEARANCES:**
**For the Government:**
        U.S. ATTORNEY'S OFFICE - LOS ANGELES, CA
        By:  **Annamartine Salick, Esq.**
             **Christopher D. Grigg, Esq.**
        312 N. Spring Street, Suite 1300
        Los Angeles, CA  90012

**For the Defendant Jean Baptiste Kingery:**
        JOY BERTRAND ESQ. LLC
        By: **Joy Malby Bertrand, Esq.**
        P.O. Box 2734
        Scottsdale, AZ  85252-2734




Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona  85003-2150
(602) 322-7247

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

CR13-01607-PHX-SRB   **SENTENCING**   9-20-2016

```
 1              P R O C E E D I N G S

 2      (Called to the order of court at 10:03 a.m.)

 3              THE COURT:  Criminal case 13-1607.  *United States of*

 4  *America v. Jean Baptiste Kingery*.  Time set for sentencing.

 5              MR. GRIGG:  Good morning, Your Honor.  Chris Grigg

 6  and Annamartine Martin Salick for the United States.

 7              MS. BERTRAND:  Good morning, Your Honor.  Joy

 8  Bertrand appears with Mr. Kingery.  He is present and in

 9  custody.

10              THE COURT:  Ready for sentencing?

11              MS. BERTRAND:  Yes, ma'am.

12              THE COURT:  Please come forward.

13              Before we begin, there was one thing that I wanted to

14  clarify.

15              Page 14, the Justification section of the Plea

16  Agreement -- or of the Presentence Report reflects that the

17  Plea Agreement provision for a sentence not to exceed 60

18  months is an 11(c)(1)(B) stipulation.

19              Does the government agree?

20              MS. SALICK:  I believe that's not correct, Your

21  Honor.  And if I could just have a second, I'll find the

22  correct cite for it.

23              THE COURT:  That's why I raise it because the Plea

24  Agreement that you use has two separate references to that.

25  One could be interpreted as (c)(1)(B) but the other one
```

CR13-01607-PHX-SRB   SENTENCING   9-20-2016

1    appears to be a binding stipulation but doesn't reference the

2    rule.

3                MR. GRIGG:  Your Honor, if I may clarify?

4                THE COURT:  Let's have one lawyer only address a

5    single question from the Court.

6                MS. SALICK:  Your Honor, it was the parties'

7    understanding that this was -- this plea was entered pursuant

8    to a c(1)(B)(ii).

9                The government agreed not to recommend anything

10   beyond 60 months.  We are not recommending a binding plea.

11               THE COURT:  Okay.  I want to know when I accept this

12   Plea Agreement if I'm accepting an 11(c)(1)(C) stipulation or

13   not.

14               MS. SALICK:  You are not, Your Honor.

15               THE COURT:  Do you agree, Ms. Bertrand?

16               MS. BERTRAND:  Yes, I do, Your Honor.

17               The understanding between the parties, I think the

18   second provision that the Court may be referencing, is the

19   limited waiver of appellate rights where the parties agree

20   that if the defendant is sentenced above a sentence that would

21   be outside the range of Offense Level 23, he can appeal that.

22               But I wish I could stand here and tell the Court that

23   this is an 11(c)(1)(C), but it was not my understanding that

24   it is either.

25               THE COURT:  Thank you very much.

UNITED STATES DISTRICT COURT

CR13-01607-PHX-SRB   SENTENCING    9-20-2016

1          Sir, please state your full name.

2          JEAN BAPTISTE KINGERY:  John Baptiste Kingery.

3          THE COURT:  What is your date of birth?

4          JEAN BAPTISTE KINGERY:  October 16, 1970.

5          THE COURT:  The Plea Agreement previously entered is

6    accepted and entered of record.

7          There has been a determination of guilt by a plea of

8    guilty.

9          It is now the judgment of the Court that the

10   defendant is guilty of Attempted Violation of the Arms Export

11   Control Act, a Class C felony, in violation of Title 22,

12   United States Code, Section 2778 and 22 Code of Federal

13   Regulations, Sections 121.1, 123.1, and 127.1.

14         I have read the following:

15         The Presentence Report and its recommendations,

16   Defendant's Sentencing Memorandum, the Government's Response

17   to the Sentencing Memorandum, the Medical Records in Support

18   of Sentencing Memorandum, and the Government's Response to

19   Presentence Investigation Report and position with respect to

20   sentencing of defendant.

21         Ms. Salick, have you read the report and

22   recommendations?

23         MS. SALICK:  Yes, Your Honor, I have.

24         THE COURT:  Do you agree with the advisory guideline

25   calculation of Offense Level 23, Criminal History Category I?

CR13-01607-PHX-SRB   SENTENCING    9-20-2016

1            MS. SALICK:  Yes, Your Honor.

2            THE COURT:  Any errors or objections?

3            MS. SALICK:  The only objection is what we noted in

4    our response to the Presentence Report which was just a

5    disagreement as to whether or not the departure applies that

6    the Probation Office cited.

7            THE COURT:  You're referring to the one level upward

8    departure.

9            That's a recommendation, not an objection, I believe.

10   It's an argument that you wish to make that it's not

11   applicable?

12           MS. SALICK:  That's correct, Your Honor.

13           THE COURT:  Ms. Bertrand, have you read the report

14   and recommendations?

15           MS. BERTRAND:  Yes.

16           THE COURT:  Do you also agree with the advisory

17   guideline calculation?

18           MS. BERTRAND:  Yes.

19           THE COURT:  Any errors or objections?

20           MS. BERTRAND:  Not to the calculations, no.  Thank

21   you.

22           THE COURT:  Mr. Kingery, did you read the report and

23   recommendations?

24           JEAN BAPTISTE KINGERY:  Yes, Your Honor.

25           THE COURT:  Did you and your lawyer have a chance to

CR13-01607-PHX-SRB   SENTENCING   9-20-2016

```
 1    discuss the contents of the report?
 2              JEAN BAPTISTE KINGERY:  Yes, Your Honor.
 3              THE COURT:  Are there any errors in the report that
 4    you would like to bring to my attention for correction?
 5              JEAN BAPTISTE KINGERY:  I brought them to the
 6    attention of my attorney.
 7              THE COURT:  Are they things that I need to be
 8    concerned about or are they things that you brought to the
 9    Probation Officer and they have been changed?
10              MS. BERTRAND:  Your Honor, there is nothing regarding
11    the calculations that's of concern.
12              THE COURT:  Okay.  Thank you.  Have you been
13    satisfied with the representation that Ms. Bertrand has
14    provided?
15              JEAN BAPTISTE KINGERY:  Yes, Your Honor.
16              THE COURT:  Before I ask Ms. Bertrand to speak, I
17    wanted to ask the government, because it isn't clear from the
18    Presentence Report -- and the defense suggests that the
19    defendant was held by Mexican authorities exclusively for the
20    DEA.
21              And I don't know whether that's true or not.  I don't
22    know whether he was charged and convicted and sentenced for
23    some crime in Mexico or whether this arrest and -- on
24    October -- on August 31, 2011, and detention is purely at the
25    behest of the DEA.
```

1          MS. SALICK:  Your Honor, it was not at the behest of

2    the DEA.  The Mexicans had a significant interest in

3    prosecuting the defendant.  He was arrested on Mexican

4    charges.  He was held on Mexican charges.

5          The United States within a month of the defendant's

6    original arrest in Mexico did obtain a provisional arrest

7    warrant and that was served on the defendant at a later date.

8          But this was not concocted by the government as the

9    defendant has put forward in his position paper.  The Mexicans

10   had a valid interest and a prosecution interest in the

11   defendant and exercised that.

12          THE COURT:  Was he prosecuted and convicted and

13   sentenced?  Or was he just charged and held for a long time

14   and eventually they allowed him to come to the United States

15   on the provisional arrest warrant?

16          MS. SALICK:  There is some ambiguity in the record on

17   that account and the government understands that.

18          We had an MLAT pending.  And when this case resolved,

19   the status of the Mexican charges has never been fully

20   explained to me.  So I understand that that is still an

21   ambiguity in the record.

22          THE COURT:  Okay.  But from the government's

23   perspective he was held on charges filed by Mexico?

24          MS. SALICK:  Correct.  He was held on Mexican

25   charges.  I am not aware if he was sentenced.  That's the only

1    thing I don't know.

2          THE COURT:  Okay.  Thank you.

3          Ms. Bertrand, what would you like to say on your

4    client's behalf?

5          MS. BERTRAND:  I'll start with the topic that the

6    Court just ended with the government.

7          His arrest in Mexico was coordinated by the ATF.  ATF

8    agents were present when he was arrested.  ATF agents --

9          THE COURT:  I said "DEA" but I misspoke.

10          MS. BERTRAND:  That's okay.

11          THE COURT:  I meant the "ATF."

12          MS. BERTRAND:  The government.

13          ATF agents were present when he was transported from

14    Mazatlan to Mexico City.

15          ATF agents, per Mr. Kingery, I'll proffer, told

16    Mr. Kingery on that flight:

17          You can talk to us now and we can make this flight go

18    north.

19          He was then held in Mexico for 30 days before the

20    government showed up, the same set of prosecutors from Los

21    Angeles showed up.  In the 30 days before he met with them, he

22    was beaten, he was suffocated with a plastic bag over his

23    head, he was tied down to the point where he soiled himself.

24          The day before the government came to interview him

25    the guards in the Mexican prison came to him and said:

1          Put on these clean clothes and shower.

2          He hadn't had toilet paper, soap, or clean clothes

3     for 30 days.

4          They cleaned him up, took him to a building where he

5     walks past a plate of food and he's very hungry, walks into a

6     room where there's a bunch of Americans sitting there in suits

7     wanting to talk with him.

8          He's denied an attorney.  He's told he can have a

9     Mexican attorney whenever one gets there.  And apparently,

10    failing that test, he is escorted out from that questioning

11    and given no food that was there for him.

12          Whether or not he was held on Mexican charges is

13    still, like the government said, ambiguous.  What is clear is

14    he is not sentenced.  He was told there were charges.  He was

15    never served with those charges.  He was never able to answer

16    those charges if they were issued.

17          And suffice it to say --

18          THE COURT:  Well, was the Mexican attorney that he

19    had that I learned about sometime ago with respect to his

20    extradition, not with respect to his defense of whatever

21    charges that were filed in Mexico?

22          MS. BERTRAND:  Correct.  That's my understanding,

23    Judge.  I'm not -- I have tried -- I have done my best to

24    learn this in this case, but it's my understanding he was

25    assisting in the extradition, not defending the criminal

1    matter, whatever that is.

2           But those charges would have been related to all of

3    this activity that was being investigated by the United States

4    government.

5           THE COURT:  Well, yes.  But, I mean, it does appear

6    from what it says in paragraph 13 that when he was arrested by

7    Mexican federal police with the assistance of the ATF that

8    there -- he was in possession of things that were probably

9    illegal in Mexico.

10          MS. BERTRAND:  I'm not -- I'm not discounting that,

11   Judge.

12          THE COURT:  I mean, the Mexican authorities had cause

13   to arrest and hold him for violations of the laws of the

14   Republic of Mexico.

15          MS. BERTRAND:  Judge, actually, I don't know under

16   Mexican law if they had cause to stop him.  And I'm not --

17          THE COURT:  Well, apparently, they were executing a

18   search.

19          MS. BERTRAND:  Right.

20          THE COURT:  And arrested him --

21          MS. BERTRAND:  Right.

22          THE COURT:  -- at that time.

23          MS. BERTRAND:  One thing that is interesting is that

24   whatever charges were issued, it appears from the extradition

25   documents that simultaneously charges were issued here; and

1    that would be in October of 2011.  So there were charges

2    pending here.

3            THE COURT:  Right.  I think that that's what the

4    government's counsel just mentioned.  That within

5    approximately a month of this arrest, they did get an arrest

6    warrant for him but it was not served for another two years.

7            MS. BERTRAND:  Right.  The extradition isn't sought

8    until May of 2013.

9            Meanwhile, Mr. Kingery sits in these Mexican

10   facilities.  After the interview -- I use that term loosely --

11   with the government, Mr. Kingery reports that there was at

12   least one other instance where he was taken to a different

13   facility.  He was taken into a downstairs area that was damp

14   and dark.  He was blind folded and there were at least three

15   men in the room.  His feet were tied.  His hands were bound.

16   And they asked him were you thirsty and he said yes.  And

17   that's when the water boarding started.

18           And then they gave him papers and said sign these

19   papers and he couldn't even read them.  Some of the papers

20   were blank.

21           And at that point he's willing to do whatever they

22   ask of him but he doesn't even know what he's reading or

23   signing.

24           While he was in custody he asked to contact the

25   Embassy, the American Embassy.  He was told the phone on the

1   wall in the prison had the wires cut.

2          It was not until he was moved to a prison in Vera

3   Cruz where he reported at least 14 other Americans were held.

4   He was stripped naked.  Shaved bare.  Held naked in a room for

5   one person with fourteen, fifteen other men.  No heat.  No

6   glass on the windows.  And that's where he spent most of his

7   incarceration in Mexico.

8          This is a prison that I understand from State

9   Department and MC International Records is run by a gang known

10  particularly for its violence.

11         Mr. Kingery reports limited access with Embassy

12  representatives but no one helped him.  They would just come

13  check and basically see if he was still alive.  He saw people

14  killed in that prison.

15         He sits and it's a little troubling that the

16  government says in its extradition paperwork -- initial

17  extradition paperwork is that time is of the essence because

18  he has been found in Mexico.

19         Well, he wasn't found.  They lost him and left him

20  there.

21         And that time line -- I misspoke.  It's not 28

22  months.  It's 27 months -- where he sat before the government

23  wants us to count his time, I think, at best is extraordinary.

24         This is different from a client sitting in a tribal

25  jail with a lawyer getting some kind of process for a year or

1   six months before the tribe refers a matter over for criminal

2   prosecution by the federal government or the state.

3          This is the United States Government letting an

4   American citizen sit and rot for over two years.

5          And what we asked for in our Sentencing Memo is to

6   ask for some accounting for that time.  It's the government's

7   responsibility to tell us what happened to him in Mexico.  I

8   don't know.  I don't know that Mr. Kingery knows because he

9   was held pretty much incommunicado.

10          It's a 14-month difference that I'm asking the Court

11  to consider between the 60 months the government is

12  recommending and the 46 months that I'm recommending.

13          That doesn't even begin to account for what was done

14  to Mr. Kingery.  Mr. Kingery made some really bad choices and

15  was involved in things that I think were a little bit more

16  sophisticated than he realized, but didn't -- but nothing he

17  did supported this.

18          So I'll ask the Court to sentence him within the

19  Level 23 guideline to 46 months.

20          I'll make a couple other notes that also are of

21  consideration.  The government disputes that Mr. Kingery is a

22  low likelihood of reoffending, even despite his criminal

23  history score of zero.

24          And they note the repeated crossings and encounters

25  with the government.  I would note that actually before 2010

1    it was not clear that they would have been able to prove that

2    he was knowingly violating the export laws.

3              And that was a discussion in the DOJ report about

4    this case that one of the difficulties the prosecutors here in

5    Phoenix were having was whether or not they could show knowing

6    violation.  Did he really appreciate that these specific

7    components were not allowed to be transported?  He could

8    possess them here in the components but the export rules were

9    different.

10             That changed in 2010 with the *Moussaoui* decision in

11   the Ninth Circuit that loosened that burden somewhat.  And

12   that seems to be in the record when the prosecutors start

13   talking about how to bust -- prosecute Mr. Kingery -- excuse

14   me.

15             But here they do have -- they had ample opportunity

16   to arrest him and charge him and they let him -- they're

17   monitoring him going back and forth over the border.  They

18   know where his mom lives.

19             And they let this continue, much like the issues we

20   had with Fast and Furious here in the Valley.

21             So for them to say, well, he was this repeat

22   offender, (a) I don't know that he offended the law pre-2010;

23   and (B) they're kind of ratifying it.  And it took them three

24   years, four years to get serious about him.

25             And now they want to say, well, no, he's clearly in a

CR13-01607-PHX-SRB  SENTENCING    9-20-2016

1   much higher risk of reoffending.

2          I would posit to the Court that given his experience

3   in Mexico and given what is statistically the likelihood the

4   Sentencing Commission has found, he is not.

5          He's older.  He's better educated than most

6   defendants who come through here.  I would posit to the Court

7   his risk of reoffending is low.

8          In terms of the risk of punishment or the need to

9   punish, I think the punishment here has been quite

10  significant.

11         And in terms of deterrence, put him on supervised

12  release.  Don't let him cross that border without the Court's

13  permission, if at all.  Put him on GPS if you want.  But he

14  doesn't need to sit anymore.  He served a sentence beyond what

15  any of us could imagine.

16         THE COURT:  Thank you, Ms. Bertrand.

17         MS. BERTRAND:  Thank you.

18         THE COURT:  Mr. Kingery, what would you like to say

19  on your own behalf?

20         JEAN BAPTISTE KINGERY:  Basically, Your Honor, I made

21  a bad decision on a personal, moral level, over six years ago

22  and I knowingly broke the law.

23         And it's been over five years that I have been in

24  prison and it hasn't been a single moment of every day that's

25  gone by that I haven't thought about it.  And, you know, I'm

1   just -- I'm really sorry, you know, for hurting my family and

2   I'm ready for whatever you decide, Your Honor.

3          THE COURT:  Thank you.

4          MS. BERTRAND:  Judge, just one thing.  His family is

5   present.  They don't plan to talk today but they are here for

6   him and support him.

7          THE COURT:  Ms. Salick, what would you like to say

8   for the government?

9          And before you start, may I clarify?  Ms. Bertrand

10  suggested that you and/or Mr. Grigg actually visited

11  Mr. Kingery in Mexico.  Is that so?

12         MS. SALICK:  Part of it is correct.  Mr. Grigg and

13  Mr. Fitzgerald visited Mr. Kingery in October of 2011.

14         THE COURT:  All right.  Thank you.

15         MS. SALICK:  Your Honor, just very briefly, I just

16  wanted to correct the record on a couple of the issues that

17  defense counsel has raised.

18         Again, this idea that the government concocted the

19  defendant's arrest is simply not supported by the facts and

20  actually does not make any sense.  Mexico had an interest in

21  prosecuting him.  He was -- they executed a search warrant.

22  He was found based on legal process.  He was held based on

23  Mexican charges.

24         At that time the government did obtain a provisional

25  arrest warrant one month after the defendant's arrest in

1   Mexico.  The defense is --

2          THE COURT:  Okay.  Let me just stop.

3          We know you got that but did you do anything with it?

4   And why not?  I mean, why was it not for -- until December of

5   2013 that you started the process of trying to get Mr. Kingery

6   to Arizona for prosecution?

7          MS. SALICK:  Your Honor, the process was begun as

8   soon as the provisional arrest warrant was sought, which is

9   October 2011.

10         The process for extradition, as the Court well knows,

11  is a lengthy process.  This was -- there were many discussions

12  being had and the defendant's case was definitely on the

13  government's radar and we were interested in pursuing and

14  continuing to pursue the charges.

15         But for reasons that I am not clear on, it did take

16  longer for the execution of the provisional arrest warrant.

17         THE COURT:  So it was -- you believe it was the

18  Mexican authorities that delayed the execution of the warrant

19  for approximately two years?

20         MS. SALICK:  No, Your Honor.  I believe that there

21  were discussions that I am not aware of that led the process

22  that can already be a length process, the extradition process,

23  to be longer in this case.

24         THE COURT:  Okay.  Go ahead.

25         MS. SALICK:  In respect to the new allegations that

1    the defendant was supposedly tortured while he was in custody,

2    again, this is -- this is in direct contrast to the

3    defendant's own statements.

4         On a number of occasions the defendant was asked by

5    U.S. personnel whether he had been treated in any -- in any

6    threatening or if he had been injured by the Mexicans.

7         He was first asked this the day of his arrest.  He

8    was asked this on two occasions that day and the defendant

9    said that he had not been.

10        Following that, on September 2nd he was asked again

11   if he had been mistreated during which time we have just heard

12   he was allegedly water boarded.  And he said that he was doing

13   fine.  And, in fact, he laughed and asked why was the ATF

14   continuing to ask him about his personal state.  He was fine

15   and he actually said he was doing fine and he had been treated

16   very well by the Mexicans.

17        And then later when two AUSAs from the Central

18   District came to meet with him, he did not advise them in any

19   way that he had been subjected to any sort of mistreatment by

20   the government -- by the Mexican officials.

21        At this time he was also cooperating significantly

22   with the Mexicans.  And so it simply does not make sense that

23   the Mexicans would be undergoing some of the terrible

24   mistreatment that we have heard today.

25        The government has addressed the defense position

1    that the defendant's criminal history makes him a low threat

2    of recidivism in its papers.  I won't belabor this, but I do

3    think that that's wildly inaccurate to say that his criminal

4    history should be regarded as a zero after the defendant

5    himself has admitted to engaging in unlawful military grades

6    munitions transfers for many years prior to his arrest in

7    Mexico.

8           And just lastly, Your Honor, the government, as it

9    has in its position papers, maintains that 60 months is the

10   appropriate sentence.

11          The defendant's conduct was egregious.  By his own

12   admission, it spanned multiple years.  He netted a significant

13   profit from his trafficking in arms.  And to say that the

14   defendant was somehow unaware of his conduct or the severity

15   of his conduct is just incomprehensible considering that the

16   defendant himself admits that he showed the cartel members how

17   to repurpose grenades so that they would function more

18   efficiently.

19          The defendant knew what he was doing.  And as the PSR

20   accurately captures in the description of the Offense Conduct,

21   time served is not an appropriate sentence in this case based

22   on the characteristics of the defendant and this offense.

23          THE COURT:  Thank you.

24          The Court finds the Presentence Report is accurate

25   and that it correctly calculates the Offense Level and

 1    Criminal History Category at 23 and I, respectively.

 2          The Guidelines suggest the defendant should be

 3    sentenced between 46 and 57 months in prison.

 4          Having considered the Guidelines recommended

 5    sentencing range, the Court is required to impose a sentence

 6    that is sufficient but not greater than necessary to comply

 7    with the sentencing purposes.

 8          And I want to speak first about the seriousness of

 9    the offense.

10          The defendant admittedly, over the course of several

11    years, smuggled arms, ammunitions, and things that could be

12    used to create a real hand grenade -- parts for hand grenades

13    into Mexico to aid the drug cartels.

14          This conduct, in my opinion, is reprehensible.  At

15    the time that the defendant was smuggling these munitions into

16    Mexico, you could not turn on a radio or read a newspaper or

17    look at any news report without hearing about the extreme

18    violence that the drug cartels were perpetrating throughout

19    many different states in Mexico.

20          There have been reports of many, many, many murders

21    as a result of the drug cartel activities during that time

22    period.  And Mr. Kingery clearly was aiding in that violence

23    by smuggling munitions, arms, ammunition, and component parts

24    for hand grenades into Mexico.

25          In my view he committed an enormously serious crime

1    and he did it, as far as I can tell, exclusively for financial

2    gain.  I didn't read anything that suggested that he did it

3    because he was under any type of duress or that his family

4    members were being threatened, some of the things that we hear

5    about why people have committed crimes that are related to

6    drug trafficking organizations.

7         The history and characteristics of the defendant do

8    not reflect any other criminal activity.  But this in and of

9    itself is enough.  It's, as I said, reprehensible.  It

10   occurred over a long period of time and it involved lots of

11   different smuggled munitions into Mexico.

12        Deterrence of both general and specific is

13   significant.  If what Mr. Kingery reports to his lawyer

14   happened to him in the Mexican jails, I suspect that he has

15   been deterred from committing anything that could be plausibly

16   considered illegal under Mexican law.

17        In fact, if I were he, I would never set foot across

18   the border again for fear that something like this could

19   happen again.

20        But there were obviously significant sums of money to

21   be made by doing what he did.  And others need to know that

22   if, in exchange for money, they smuggle munitions out of the

23   United States and into another country, particularly for the

24   purposes of fueling the violence of the drug cartels, that

25   they will suffer a significant punishment for doing so.

1    If what Mr. Kingery reports happened, did happen to

2    him in the Mexican prisons, then that is a horrible thing.

3    But I don't think that there is any evidence that the United

4    States government was complicit in that.

5    The United States government, at most, didn't push

6    the extradition as fast as they could have.  But that doesn't

7    mean that the Mexican authorities wouldn't have continued to

8    hold him for whatever criminal conduct Mexico believes that

9    Mr. Kingery committed in their country.

10    According to the Presentence Report, the defendant

11    will receive credit from the date of the execution of the

12    provisional arrest warrant by the authorities in Mexico which

13    was on December 1, 2013, amounting to approximately 34 months

14    in presentence incarceration credit.

15    Had the defendant not spent so many months in custody

16    in Mexico, this Court might well have considered a sentence

17    greater than that recommended in the PSR.  I don't think that

18    we are in a situation where I should be reducing the sentence

19    because of the time he spent in Mexican custody like we

20    sometimes do for individuals who are held on the same charges

21    in another jurisdiction, specifically in Indian Country.

22    Rather, in my view, were it not for the fact that the

23    defendant has been in custody for the same conduct since 2011,

24    I would be looking at a sentence in excess of 60 months

25    because of what I described as this reprehensible conduct.

1          I believe that a 60-month sentence is clearly

2    appropriate here based on the nature and circumstances, the

3    repeated nature of the offense, the materials that he was

4    supplying, and the people to whom he was supplying them and

5    doing it just for money.

6          Therefore, pursuant to the Plea Agreement and the

7    Sentencing Reform Act of 1984, it is the judgment of the Court

8    that the defendant be committed to the custody of the Bureau

9    of Prisons for 60 months and pay a $100 special assessment

10   which is due immediately.

11         The Court finds the defendant does not have the

12   ability to pay a fine and orders the fine waived.

13         While incarcerated, the criminal monetary penalties

14   shall be paid at the rate of not less than $25 per quarter

15   pursuant to the Bureau of Prisons Inmate Financial

16   Responsibility Program.

17         And if not fully paid, upon release, at the rate of

18   not less than $25 per month to commence 60 days after release

19   to supervised release.

20         When the defendant is released from prison, he will

21   be on supervised release for three years.  While on supervised

22   release, the defendant is ordered to comply with all standard

23   conditions of supervision adopted by the Court in General

24   Order 12-13.

25         Of particular importance is that defendant not commit

1    another federal, state, or local crime during the term of
2    supervision.
3         The defendant is also ordered to comply with the
4    following additional conditions:
5         The defendant is ordered to participate in a mental
6    health program as directed by his probation officer, which may
7    include taking prescribed medication, and contribute to the
8    cost of treatment in an amount to be determined by his
9    probation officer.
10        The defendant is also ordered to participate as
11   instructed by his probation officer in a program of substance
12   abuse treatment, which may include testing for substance
13   abuse, and contribute to the cost of treatment in an amount to
14   be determined by his Probation Officer.
15        While on supervised release, the defendant is ordered
16   to abstain from all use of alcohol and alcoholic beverages.
17        The defendant must also submit his person, property,
18   home, residence, vehicle, papers, or office to a search
19   conducted by his probation officer.  Failure to submit to
20   search may be grounds for revocation of release.  And the
21   defendant should warn other occupants that the premises may be
22   subject to searches pursuant to this condition.
23        The defendant is ordered to report in person to the
24   Probation Office in the district to which he is released
25   within 72 hours of his release from the custody of the Bureau

1    of Prisons.

2           Mr. Kingery, had you gone to trial and been

3    convicted, you would have had a right to appeal from the

4    orders of the court and to have a lawyer represent you.  If

5    you could not afford a lawyer, a lawyer would have been

6    appointed and the necessary records and transcripts provided

7    at government expense.

8           You do not have these rights to appeal based on the

9    limited waiver of appeal set out in your Plea Agreement.  I

10   believe that you have waived all available rights to appeal.

11          But I suggest that you should talk to your lawyer

12   about this and satisfy yourself concerning your appeal rights.

13          If, after talking to your lawyer, you think you have

14   a right to appeal and you want to exercise that right, you

15   must do so by filing a Notice of Appeal within 14 days of

16   today or any rights you think you may have to appeal will be

17   waived.

18          Do you understand?

19          JEAN BAPTISTE KINGERY:  Yes, Your Honor.

20          THE COURT:  Is there anything further from the

21   government?

22          MS. SALICK:  Your Honor, the government moves to

23   dismiss Counts 2 and 3 of the underlying Indictment.

24          THE COURT:  So ordered.

25          Ms. Bertrand, anything else?

1           MS. BERTRAND:  No.  Thank you.

2           THE COURT:  Thank you.  Court is in recess.

3       (Proceedings adjourned at 10:41 a.m.)

4                           * * *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CR13-01607-PHX-SRB   SENTENCING    9-20-2016

1

2                        C E R T I F I C A T E

3

4          I, ELIZABETH A. LEMKE, do hereby certify that I am

5    duly appointed and qualified to act as Official Court Reporter

6    for the United States District Court for the District of

7    Arizona.

8          I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion

10   of the proceedings contained herein, had in the above-entitled

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control.

13         DATED at Phoenix, Arizona, this 3rd day of December,

14   2016.

15

16

17

18

19                         s/Elizabeth A. Lemke
                           ELIZABETH A. LEMKE, RDR, CRR, CPE
20

21

22

23

24

25